May it please the court. Good morning, your honors. My name is Kat Caballo, and along with my co-counsel, Carla Eakins, we represent the plaintiff appellant, Amanda Jones. In my discussion with you this morning, I will begin by distinguishing the Midget v. Tri-County Metropolitan District case a little more. I'll then move to a brief discussion on Appley's liability under the ADA Section 504 of the Rehabilitation Act and the UNRRA Act. And then we'll end with a discussion on injunctive and declaratory relief. Your honors, the Midget v. Tri-County Metropolitan District case, which is this court's decision in 2001, does not support Appley's defense. We have argued throughout our briefing on summary judgment and here on appeal that Midget is distinguishable because wheelchair lift regulations, which were at issue in that case, I'll cite that for you, 49 CFR Section 37161, expressly allows for occasional and isolated violations of the regulation. That is not the case here. The regulation we are discussing today is 49 CFR 37.173, which is the trained to proficiency regulation. And there's an obvious reason why that's the case. The trained to proficiency regulation does not allow for occasional or isolated violations. Training is integral to safe and reliable accommodation to people with disabilities. Without adequate training, Ms. Jones and others like her who travel with different kinds of mobility aids are at continued risk. But isn't the basic principle at least analogous that just as a bus, the fact that one bus has a broken wheelchair lift doesn't mean that you don't have wheelchair lifts. The fact that one bus driver maybe doesn't know the right thing that he's supposed to do with the scooter doesn't mean that you don't have adequate training. Trained proficiency doesn't mean that everyone has perfect knowledge of what to do in every situation, does it? Understood. And thank you for the question, Your Honor. This is unfortunately not just an instance of one driver not following the rules or not having adequate training or making an error in this one instance. Mr. Gonzalez, who is the driver of issue here, driving off despite being unable to secure her scooter safely is a testament to the wholesale failure of the training program that the Transit District had. It's also unclear from the record whether or not there was any training on how to secure a three-wheeled mobility aid. At best, appellees are able to prove that they have some training, but our argument, Your Honor, is that that is not enough for summary judgment. That issue should have been reserved for the jury at trial. We've got some record of there being training and some record of there being training on mobility devices. But as I've mentioned, there is not really any evidence of what training there was on how to secure something with three wheels versus four wheels. And if we turn to the annual training agendas, then we'll talk about how it wasn't four wheels versus three wheels, but that this was an unusually small device. Your Honor, we would argue that it is because it's three wheels. The tires on my client's scooter are somewhat different, but they're not that much different from a regular scooter, or I believe the deposition testimony of the driver is that our client's scooter had small tires. If you look at, again, unfortunately the record is not well developed in this regard, how he secured my client's scooter would not have secured a scooter with larger tires either. So the issue here, again, is was there any training on what to do when your mobility aid has one point of contact at the front versus two? In this case, the safety and training coordinator, Mr. Pena, in his deposition, testified that the bus in question here had a four-point strap security system. That means that there are two straps at the front, but what do you do when there's only one wheel in the front? And that clearly was a point of confusion for this driver, which would have been remedied had there been some training on how to secure a mobility device. That's clear throughout the record. If you turn to the annual training agendas, which are in the record, and show what the annual training agendas were for each year leading up and through a couple years after the accident, you'll find those records at ER 2592 to 2600. And you'll see that none of those training records describe training on three-wheeled aids. You'll also notice that in 2007 and 2009, the annual training did not include any mobility aid securement, four-wheeled, three-wheeled, wheelchairs, or otherwise. And that's specific to 2007 and 2009. In fact, Your Honors, the only documented reference to three-wheeled devices is Exhibit A to the declaration of Mr. Pena. And he admitted in his deposition that Exhibit A may not have been provided to drivers at all, and if it was, it was used inconsistently. Moreover, Exhibit A doesn't explain how to secure a three-wheeled device. It references an integrated scooter ring, but it doesn't explain how to use it. It doesn't, excuse me, it does not explain what to do if a scooter ring is not on your bus. And more importantly, it doesn't explain how to secure a three-wheeled device when the bus has a four-point retracting strap system versus a three-point system. And Your Honors, just so we're clear here, I am not, and we are not, on Ms. Jones' behalf, arguing that the Transit District was required to train on every type of device on the market. However, Applebee's never challenged that the Transit District is required to train its drivers on three-wheeled mobility aids. And in fact, the Transit District admits that it is required to transport mobility devices whether they're designed to be transported on a bus or not. That's in the record at 1-2-3-1. That's Mr. Pena's deposition. This is consistent with the regulation regarding training to proficiency. Because that regulation does not limit training to the securement of mobility aids that may not have a manufacturer disclaimer or limitation. And the requirement, in short, to train to proficiency is absolute. It's not qualified by the type of mobility aid a person is using. Let me not forget to highlight that training to proficiency also includes not just how to secure a three-wheel device versus a four-wheel device, but it also includes what to do when you can't secure a device. And in this case, in addition to the lack of training on how to secure a mobility aid, the training was clearly deficient because Mr. Gonzalez drove off knowing that he could not and did not secure Ms. Jones safely to the bus. Instead of calling for another vehicle, such as a paratransit vehicle, who could have secured her safely. And again, why is that? I mean, granting, for sake of argument, that that's not what he was supposed to have done, why is that evidence of inadequate training? I mean, even people who are adequately trained sometimes make mistakes, right? Again, Your Honor, I would refer you to the record. The record is deficient of any training on how to secure a device. And so we're not just relying on the fact that this particular driver failed in this instance. If you look to the record, we could not find any training on how to secure a three-wheel device, which the transit district admits it was required to do. Right, but I guess I was just responding to your last point. My understanding was that the manual for drivers did tell them that you're not supposed to operate the bus if you haven't properly secured the device, right? So in that respect, he was doing something contrary to what he had been told to do, wasn't he? Assuming that that information was actually given to all the drivers, it's also in the record, Your Honor, that that handbook was not provided to Mr. Pena, despite being a veteran of 30 years with the transit district. Now I see my time is concluded. I'd like to defer the next four minutes to my co-counsel, Ms. Aikens. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. I'm Carla Aikens on behalf of Appellant Amanda Jones. I would just like to—I'm addressing the negligence portion of the appeal. And at the outset, I would like to just clarify that the district court did not consider the fact that plaintiffs had moved for summary judgment on the standards dealing with the ADA, the UNRRA Act, and the Rehabilitation Act. That was plaintiff's motion for summary judgment. But defendant filed a motion for summary judgment on the basis of the assumption of the risk, and that's why we briefed that, because in case Your Honors got to that point. But our count five of plaintiff's third amended complaint is just based on negligence as a common law negligence. It's not based on any particular statute. And so the court only analyzed it with respect to that. So I just want to make it clear, because I think it was a little bit convoluted. And the actual negligence standard under common law is not actually addressed, because he never gets to the assumption of the risk doctrine, because he says that we did not—we didn't prove that there was negligence under those particular statutes. So I think— Counsel? Yes, Your Honor. Counsel, on the negligence point, I'm happy to get to that. But based on the record that we have now, it's correct, isn't it, that the bus driver, when it became apparent that Jones's scooter could not be completely attached, offered her alternative seating arrangements in the disabled portion of the bus? That's what the district says. We dispute that. So I think that's one of the reasons why negligence is not an appropriate standard for summary judgment. And this is one of those instances, because she disputes that anybody ever asked her to move or to get into a seat. And I honestly— She specifically disputes that the bus driver offered her alternative seating, correct? Yes, Your Honor. Yes. And the bus company and the driver say, we did. I think only the driver could speak to that. The company states that that's what the standard is. I thought there was a witness on the bus who, in addition to saying the bus wasn't speeding, another question, but said that your client was offered alternative seating. Well, part of the issue— I'm not trying to resolve—Counsel, I'm not trying to resolve that question. But that's in the record, isn't it? It is, Your Honor. And I did that deposition. And part of the issue there is that there's a dispute as to how all of these things happened, because the way that it works is that the disabled people get onto the bus first. And so it would be questionable that Mr. Nieto even heard that happen. And so Ms. Jones disputes that anybody stated that. Go ahead, Colonel. You understand that, as the record states right now, your client said no alternative seating offered, but there is some deposition testimony to the contrary. If that's a material fact question, you win? Win on summary judgment as to negligence? No, no, you get the summary judgment reversed. If it's material and it's disputed, then you win. So why argue about it? I mean, if that's how you feel, I don't have to. That's my position. I mean, again, it was disputed, and so I won't go into that. If Your Honor is satisfied as to that, then I do believe that that on its own would be a basis for reversal. Absolutely. I have one other question. Sure. Is it correct that your client offered to show the bus driver how to securely affix her wheelchair, her scooter? That's correct. And that's at ER 1815 to 1817 is her declaration where she clarifies that. I think she testified as to that as well. But she told him how – excuse me, I'm sorry. You know what my next question is going to be? I actually don't. I wish I did. Does the bus company dispute that? That they – I don't think they did. I have not seen anything where they stated that they did not tie it. And so to your point about – No, no, no. I'm sorry. No, no, no. Does the bus company and the driver dispute the fact that Ms. Jones offered to show the driver how to securely affix the scooter? I don't believe that was addressed. No. Go ahead. I was listening to your rebuttal time. Oh, no, that's fine. I see the two minutes. And so I'm going to be quiet then and I will let Ms. Caballo deal with the rest of it. So thank you very much for your time. Thank you. Ms. Nicholson. Good morning, Your Honors. Thank you. May it please the Court. Suzanne Nicholson. I'm here on behalf of Amtrak and Santa Cruz Metropolitan Transit District. On the negligence – counsel, on the negligence issue, can you respond to the questions I asked Ms. Atkins? One, was she offered – was Ms. Jones offered separate disabled accommodation? And two, did Ms. Jones offer to show the driver how to securely affix her scooter? Okay. Well, your first question, there is a dispute about whether or not Ms. Jones was offered – whether the driver offered her to sit in a fixed passenger seat. And we have the driver and we also have another passenger on the bus testifying that, in fact, they did offer, would you like to move off the scooter as they are trained to do? And she declined. Is it your position on that first question that it's not material? That is our position. I don't think that's a duty of care that would reach a standard of negligence. If you look at the regulations, they talk about even if you offer someone a fixed seat, you may ask them to sit in a fixed seat, but you can't require them to because disabled persons have to have the same freedom to, you know, on the bus as any other passenger. So if they choose to sit on their scooter, then that's their choice. So I would argue that whether or not she was offered the opportunity to move to a fixed seat, that's not a material fact that would not be a breach of any legal duty of care on behalf of the district. How about the second question? The second question had to do with – I'm sorry. Did she offer – did Ms. Jones offer to show the driver how to safely affix? Okay. So that assumes – I just want to address first that the question assumes that the securement that the driver did was not proper or that there's only one single way to affix the scooter because there's no evidence in the record of what a proper way to do that is. And I think counsel has admitted – Isn't there on that point kind of a – I mean, like, things fell over, right? So isn't that evidence that it was not properly secured? No, I don't think so, Your Honor, because the fact is is that scooters, by their very nature, and it's obvious to everyone and it's in the record that it's an obvious risk that, you know, you shouldn't be sitting on them in a bus that they tip over even if they are secured. And that's why you have a manufacturer who the handbook is saying don't ever sit on these in a moving vehicle because no matter how you secure it, there's always going to be that risk. You cannot absolutely secure it so it will never tip over. That may be, and that may be why you might ultimately have an assumption of risk or a contributory negligence argument. But isn't there just a common law duty on the part of the driver of a vehicle not to operate the vehicle when there's some large – it could be a scooter, it could be a big piece of luggage, some large object that's not secured that could fall over and hurt someone. I mean, isn't that a violation of a common law duty? Well, I think the duty is to make your best efforts to make sure it's as secure as possible. And if you look at the regulations and the purpose of those regulations, a lot of that purpose for securing the scooter is to make sure that if something happens, the scooter doesn't, or whatever mobility device it is, doesn't shoot off and act as a missile inside the bus, right, and injure somebody else. So it's not necessarily designed strictly to protect the person who's on the device because I think you cannot absolutely – like it's impossible to – you can't have – let me phrase it this way. You can't impose a duty on the transit district to 100% absolutely secure a device that the manufacturer is telling you is not designed to be used in a moving vehicle. You take the position, as I understand it, number one, that Ms. Jones' scooter was in fact properly secured, correct? We don't really know from this record what properly secure means. All we know is it tipped over. So I think the plaintiff would like you to infer from that that it was not properly secured. Our position is that no matter how you secure it, there's always going to be some risk of a tip over on this device. And how does a person in Ms. Jones' position be warned of that? Well, she has the manufacturer's manual, which I believe the record states that she read, and I don't want to say that 100%, but I believe that's in the record that she received that manual that tells her never to sit on that scooter. You have testimony from witnesses who train on devices that the risk of tipping over on a scooter is absolutely an obvious one. Anybody can see that. You have training of people that, you know, anytime a scooter comes on the bus, you should ask them if they want to move to a fixed seat because they have an inherent risk of tipping over. But as I understand the evidence that your client put in the record, it was that, A, the bus driver was not speeding, correct? Correct. There was traffic, for example, passing by that was going at a greater rate of speed? Yes. Correct? Yes. And that the turn that the driver made was done safely? Yes. Yet the wheelchair, the scooter still tipped over. One other question. It is correct that this bus driver, and perhaps all of the bus drivers on this particular line, were not trained in safely securing a scooter of the type Ms. Jones was riding on. Is that correct? I don't think that is correct, Your Honor. Can you point to me in the record where it shows that this driver was trained specifically in securing this type of scooter? Okay. I understand your question now. It is true that drivers were not trained on how to secure every single different type of scooter on the market, including plaintiff's scooter. That is true. What they are trained is how to secure three-wheeled mobility devices generally. So it's impossible, and counsel has admitted here an argument, that they're not required to train on every single specific type of device. So you're right. This driver wasn't trained on this specific type of scooter. He'd been trained on scooters generally. That record is replete with evidence of training that is provided to secure scooters, but not this specific model. Are there buses in the system that your client operates that could have securely affixed this scooter? Well, I don't think there's any evidence that the scooter couldn't be securely affixed on this bus. It had all of the proper ADA-compliant equipment. Ms. Jones took this bus on the reverse route from San Jose to Santa Cruz and was the driver on that bus, used his best efforts to secure the scooter, and in that case, she did not tip over. So I'm not answering your question. Here's my question, and it may be that the record simply does not speak to this. Were there other buses on the line that could have more securely affixed the Jones scooter? The record doesn't speak to that. Thank you. The record states that all of the entire fleet is equipped with ADA-compliant securement systems. Thank you. I wanted to ask a question about the speed. It seems to me you can't throw out somebody's testimony because it's self-serving. You might, which I think the district court did, I think you might be able to throw it out for other reasons, such as too vague, you know, inspecific. But I thought the district judge threw it out just because it was self-serving. And isn't that against the rules? Well, we do cite cases. Isn't that an error of law? I understand your question, Your Honor. And, you know, I believe the district court cited cases, and we've cited them in our briefs, that the uncorroborated and self-serving testimony of the plaintiff is not enough to create a tribal issue. I guess the case you cited, it really goes off on much different grounds. Right. Yeah, okay. Really, a person can testify on behalf of themselves. And then the question is, what do you do with that? Right. And so I think you're correct, and I know I was preparing yesterday, and I did see a subsequent case that talks a little bit about the fact that, well, everybody's declaration is going to be self-serving. So I totally take your point on that, and I don't think you can throw it out just because it's self-serving. But I think the problem here is that not just that it's self-serving, but it's uncorroborated, and it's not based on any – it's purely speculative. There's no objective, observable facts from which you could imply or infer that the bus was speeding based on her testimony. So here's what she said. What she said is, I felt like the bus was moving at a rather rapid pace. I had the impression that the bus was going fast. And what we do know from a factual point, aside from her impressions, is that she had these feelings while she was reading. She was not looking out the window. She was not paying attention to surrounding traffic. She could not see the speedometer. So we have absolutely no factual basis from which to infer from her declaration, from her subjective feelings, that the bus was, in fact, speeding. We don't even know what the speed limit was. That's not in the record. I have a question. Counsel? Sure. Just a quick question. The case that you found just recently about self-serving? Yes. Can you provide the court and opposing counsel with the citation? You don't have to do it now. Yeah, I was thinking I wrote it down. Send the panel an email. Okay. And opposing counsel. There was something along that lines in a case written by Judge Gould. I don't know if that's the one. It is out of the Ninth Circuit. And I wrote it down. I'd have to shuffle around to find it right this minute. So I will send an email about the self-serving. But basically what it said is that being self-serving in and of itself isn't a reason to toss out a declaration. And so I will concede that. But my point is that there's other problems with this declaration, not just that it's self-serving, but that it's uncorroborated and there's no objective facts from which, in other words, no. Uncorroborated isn't a good reason either. What's a good reason is it's not specific. It's vague. Those are better, you know, not personal knowledge, vague, not specific. Right. Uncorroborated and self-serving don't get you anywhere. Ultimately it's just purely conclusive without any specific evidentiary basis for that. So I would also just point out that I think, you know, having a feeling you're going fast and the fact that the scooter actually tipped over is not enough to infer that the bus was speeding because, I mean, I was just thinking about this the other day. I mean, anybody who's driven home with a bag of groceries in the back of the car knows that any time you go around a curb you don't have to be speeding for, you know, your bags to tip over and everything fall out. So just these facts in and of themselves don't create a reasonable inference that the bus was actually speeding. And so I think the negligence claim cannot survive on that grounds. So I've used up almost all of our time on negligence. On the ADA I think we've adequately briefed all of that, the fact that there's no standing for injunctive and declaratory relief, and even if there were a violation of this training to proficiency, which I absolutely think the record does not support, we still don't have any evidence of intentional discrimination that would be necessary to support a claim for compensatory damages under those discrimination acts, ADA Rehabilitation Act and the UNRU Act. So unless there's any specific questions on the discrimination claims, I see that I'm out of time. Just one practice pointer, counsel. Of course. The next time you're working up a case for appeal and you come across a case that bears on an issue before the court, whether that case helps you or hurts your client, you should bring the court's attention to it. I understand that, Your Honor. Thank you. Thank you. I will send an email. Thank you, counsel. So who's doing rebuttal? I will be doing the rebuttal, Your Honors. You've got two minutes. Thank you. I will start where counsel left off, just to touch very briefly on the issue of intentional discrimination. I believe our briefing is clear here, but intentional discrimination is not required in this case because our client's damages claim is based on violations of the UNRU Act, which does not require intentional discrimination if it's predicated on a violation of the ADA. So in this case, all we need to do is show that there was a violation of the ADA, and that will then be a violation of the ADA, the Section 504, and the UNRU Act. To prevail on that claim, it's your position that Ms. Jones does not have to show intentional discrimination? That is correct, Your Honor. If she was basing her claim only on the ADA, then yes. Or if she was basing her claim on the UNRU Act, but not based on an ADA violation, so just on California law, then she would be required to prove intentional discrimination. But because it's an UNRU Act claim for damages, based on a violation of the ADA, the case law is clear there that intentional discrimination is not required, and that's in our briefing. On this issue of negligence— Sorry, go ahead. Does someone have a question, Your Honor? Okay. On the issue of negligence, just to also clarify here is my time is up. I don't understand, I guess. What part of the ADA becomes part of the UNRU Act? How is that divided out? Of course, Your Honor. So the UNRU Act has general discrimination provisions that are specific to California law, and I believe it's Section 51F that specifically incorporates violations of the ADA as violations of the UNRU Act. And the case law clarifies that if that's the basis for your claim, your access claim, intentional discrimination is not required to be proven by the claimant. Just very quickly on the negligence— So it's like accidental discrimination? I don't get it. Yes. So the standard for intentional discrimination under Title II is deliberate indifference. And quite honestly, Your Honors, we believe we've established on the record in the summary judgment enough information to bring that issue to trial. So even if we were to assume that intentional discrimination was required of our client, we proved that the Transit District and Council's argument for the Transit District just stated that the tip-over risk for scooters is real and that the Transit District knew about that risk but failed to include that as part of its training for its drivers. So if there is a known risk to a federally protected right and a failure to act upon preventing that discrimination, that is intentional discrimination for the purposes of Title II under the ADA. But again, we're not required to prove that because, again, the claim is based only on the Honor Act incorporation of the ADA under Section 51F. I see my time has expired. If any of you have any further questions, I'm happy to entertain. Otherwise, thank you for your time. Thank you. Your Honors, if I can, I have that site. If you want me to give it to you orally or if you would prefer an email, I can do that. That's fine. Go ahead. Okay. The case is SEC v. Phan, P-H-A-N. And the case site is 500 F. 3rd, 895, and it's the Ninth Circuit of 2007. What it says is essentially declarations are always self-serving, but if it only states conclusions, doesn't provide facts that are admissible in evidence, then the court can disregard the Declaration on Summary Judgment. So thank you. Okay. Thank you, counsel. We'll review that. Thank all counsel for their helpful arguments this morning. The case is submitted, and that concludes our calendar for the day. Thank you, Your Honor. This court for this session stands adjourned.
judges: Hawkins, Restani, Miller